United States District Court
Middle District of Florida
Jacksonville Division

SHANNON SZALA,

> *Plaintiff,*

v.                                                                    NO. **3:14-CV-1140-PDB**

COMMISSIONER OF SOCIAL SECURITY,

> *Defendant.*

---

## Order Affirming Commissioner's Decision

This is a case under 42 U.S.C. §§ 405(g) and 1383(c)(3) to review a final decision of the Commissioner of the Social Security Administration denying Shannon Szala's claim for disability-insurance and supplemental-security income benefits. She seeks reversal, Doc. 20; the Commissioner, affirmance, Doc. 23. The Court incorporates the record summarized by the Administrative Law Judge ("ALJ"), Tr. 21, 23–33, Szala, Doc. 20 at 2–4, and the Commissioner, Doc. 23 at 1–3.

### I.      Issue

Szala presents the sole issue of whether the ALJ properly evaluated the medical opinions of Norman Baldwin, Ph.D., Dawn Fox, Psy.D., and Eduardo Sanchez, M.D. Doc. 20 at 1–2.

### II.      Background

Szala was 32 on the date of the ALJ's decision. Tr. 52, 240. She last worked in 2007 as a debt collector. Tr. 54, 56. She has a ninth-grade education and no vocational training but can read, write, and do simple arithmetic. Tr. 53–54, 268. She also has

worked as a front-desk clerk and a van driver. Tr. 55–58, 273. She alleged she had become disabled in January 1987 due to anxiety, bipolar disorder, borderline intellectual functioning or retardation, obsessive-compulsive disorder (OCD), and attention deficit hyperactivity disorder (ADHD). Tr. 240–48, 262–63, 267. Her last-insured date for her eligibility for disability-insurance benefits was June 30, 2012. Tr. 263. She proceeded through the administrative process, failing at each level. Tr. 1–3, 18–33, 124–32, 136–41. This case followed. Doc. 1.

## III.   Administrative Hearing

The ALJ conducted two hearings. At the first, he explained he wanted a supplemental consultative exam because he found an initial psychological evaluation by Peter Knox, Psy. D., contained irreconcilable findings. Tr. 44–45, 483–87. Szala's attorney pointed to notes of her treating physician, Dr. Sanchez, but the ALJ found them unintelligible and thus unhelpful. Tr. 45–46. At the second, Szala, Dr. Baldwin, and a vocational expert testified. Tr. 52, 58, 61. Dr. Baldwin testified Szala could work in a supportive environment, which he defined as one with extra supervision and structure from a supervisor that would accommodate her fluctuations in mood, but she might struggle in a competitive workplace. Tr. 72–74. The ALJ posed two hypotheticals to the vocational expert. In the first, the person had no exertional, postural, environmental, or manipulative limitations; could do only simple, routine, and repetitive tasks; and could have only occasional contact with the public, co-workers and supervisors. Tr. 113. The vocational expert opined the person could perform jobs that exist in significant numbers in the national economy (packer,

cleaner, and laundry sorter). Tr. 113–14. The second hypothetical was identical to the first except the person would need a supportive environment. Tr. 114. The vocational expert opined those limitations would prevent competitive employment. Tr. 114

## IV.    ALJ's Decision

At step two,[1] the ALJ found Szala has severe impairments of bipolar disorder type II (in partial remission) and history of borderline intellectual functioning. Tr. 23. At step three, he determined her impairments, whether individually or in combination, did not meet or medically equal the severity of any impairment in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1. Tr. 24–25. He considered whether her mental impairments satisfied paragraph B or paragraph C criteria.[2] Tr. 24–25. He found she had no restrictions in activities of daily living, no

---

[1]The Social Security Administration has established a five-step sequential process for determining if a person is disabled. 20 C.F.R. §§ 404.1520(a), 416.920(a). Under the process, the ALJ asks: (1) is the claimant engaged in substantial gainful activity; (2) does she have a severe impairment or combination of impairments; (3) does the impairment meet or equal the severity of certain specified impairments in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1; (4) based on a residual-functional-capacity assessment, can she perform any of her past relevant work despite the impairment; and (5) given her residual functional capacity, age, education, and work experience, are there a significant number of jobs in the national economy she can perform. *Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004).

[2]Paragraph B requires a persistent specified condition and at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulty in maintaining social functioning; (3) marked difficulty in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Part 404, Subpart P, App'x 1 ¶ 12.04(B). Paragraph C requires a "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support" and one of the following: (1) "[r]epeated episodes of decompensation, each of extended duration"; (2) "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in

episodes of decompensation of extended duration, and moderate difficulties in social functioning and concentration, persistence, or pace. Tr. 24. He found she had not established a medically documented history of a chronic organic mental disorder lasting at least two years that caused more than minimal limitations on work activities with symptoms or signs attenuated by medication or psychosocial support and either repeated episodes of decompensation of extended duration, a residual disease process causing decompensation with even minimal increases in mental demands or environmental change, or a history of one or more years' inability to function outside supportive living arrangement. Tr. 24–25.

After stating he had considered the entire record, the ALJ determined Szala has the residual functional capacity (RFC) to perform a full range of work at all exertional levels with the following nonexertional limitations: "the claimant is limited to performing simple, routine, repetitive tasks and can have only occasional contact with the public, co-workers and supervisors." Tr. 25. He gave great weight to Dr. Sanchez's opinion that she has difficulty interacting with co-workers but little weight to Dr. Sanchez's opinion that she has marked limitations on some social functioning, finding it inconsistent with his assessment in his letter addressing her impairments and his treatment. Tr. 27.

---

the environment would be predicated to cause the individual to decompensate"; or (3) "[c]urrent history of at least 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." *Id.* at 12.04(C).

The ALJ gave Dr. Fox's opinions partial weight. Tr. 28. He accepted her borderline-intellectual-functioning diagnosis as consistent with the objective medical evidence. Tr. 28. He rejected her opinion that Szala cannot handle the stress of a routine workday because (1) Dr. Fox was a one-time examining physician relying almost entirely on Szala's subjective reports, (2) Dr. Sanchez was Szala's primary source of treatment and did not find such extreme limitations, and (3) Szala has past relevant work indicating she could perform in some work environments long enough to learn the work and perform work at a substantial gainful activity level. Tr. 28.

The ALJ rejected Dr. Baldwin's testimony, finding it inconsistent and "all over the place." Tr. 29. Dr. Baldwin wavered on whether Szala met a listing for bipolar disorder and agreed Dr. Knox's psychological examination did not support a GAF scale rating of 45 but found a GAF scale rating of 45 to 50 was appropriate based on her unsubstantiated reports of lack of impulse control. Tr. 29–30. Giving great consideration to Dr. Sanchez's records, particularly his statement that Szala's symptoms can be controlled with medication, the ALJ found her impairments cannot be as severe or disabling as alleged because she can tolerate them without taking her medication. Tr. 30–31. He also determined she could perform simple, routine tasks with other conditions if she remained compliant with her medication but could perform no past relevant work. Tr. 31. At step five, he found she could perform the jobs the vocational expert identified and therefore was not disabled. Tr. 32.

## V.      Standard of Review

A court's review of an ALJ's decision is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports his findings. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Substantial evidence "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* The court may not decide facts anew, reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment. *Id.*

## VI.     Analysis

Szala argues the ALJ erred in rejecting opinions of Drs. Baldwin, Fox, and Sanchez, contending they supported her claim she could not engage in competitive work and were consistent with each other and the evidence. Doc. 20 at 1–2. The Commissioner responds the ALJ gave valid reasons for giving little weight to the opinions that conflicted with the RFC finding. Doc. 23 at 4.

To decide the weight to give a medical opinion, an ALJ considers the physician's examining and treating relationship with the claimant, the opinion's supportability and consistency, the physician's specialization, and any other factor that supports or contradicts the opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). An ALJ must give considerable weight to a treating physician's opinion unless he shows good cause for not doing so. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004). Good cause exists if (1) evidence did not bolster the opinion, (2) evidence supported a contrary finding, or (3) the opinion was conclusory or inconsistent with his own

6

medical records. *Id.* at 1240−41. If an ALJ disregards the opinion, he must clearly articulate his reasons. *Id.* Substantial evidence must support those reasons. *Id.*

## A.    *Dr. Baldwin*

Substantial evidence supports the ALJ's disregard of Dr. Baldwin's testimony that Szala requires a supportive work setting. In summarizing Dr. Baldwin's testimony, the ALJ listed several inconsistences: (1) Dr. Baldwin testified Szala appeared to meet a diagnosis for bipolar disorder II but could not state she met the listing because there was no objective data, Tr. 71,[3] but later agreed on cross examination she might meet a listing, Tr. 92; (2) Dr. Baldwin testified Dr. Knox's psychological examination was normal other than a somewhat energetic state, Tr. 63–65, 485–87, there was no clear evidence she was exhibiting bipolar symptoms, Tr. 64, and Dr. Knox's evaluation did not justify a GAF[4] score of 45, Tr. 64–65, but later

---

[3] Szala quotes Dr. Baldwin's testimony that she could possibly meet a listing and argues he consistently testified she would require a supportive working environment and was "on the cusp" of finding that she met a listing. Doc. 20 at 12–13. Szala interprets Dr. Baldwin's testimony differently than the ALJ. This Court cannot reweigh the evidence. *Moore*, 405 F.3d at 1211–12; *see also Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986) ("The Secretary, and not the court, is charged with the duty to weigh the evidence, to resolve material conflicts in the testimony, and to determine the case accordingly.").

[4] The former version of American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) includes the GAF scale used by mental-health practitioners to report "the clinician's judgment of the individual's overall level of functioning" and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." Manual at 32–34. The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale. *Id.* at 32. A GAF scale rating of 21–30 indicates behavior considerably influenced by delusions or hallucinations, or serious impairment in communication or judgment, or inability to function in almost all areas. Manual at 34. A GAF scale rating of 31–40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school family relations, judgment,

testified he would probably assign her a score of 45 to 50 due to impulse control problems despite agreeing there were no records to indicate an impulse control problem beyond self-reports, Tr. 69–71; (3) Dr. Baldwin testified she could perform simple, routine tasks with occasional contact with the public, co-workers, and supervisors in a supportive environment, and has a reasonable memory and the ability to concentrate, but would become impulsive and reject limits and rules, Tr. 68, 72–74, but later agreed she has extreme limitations in her ability to interact such that she could not have occasional contact with others, Tr. 95–96. Tr. 29–30.

Szala argues that, while the ALJ stated he rejected Dr. Baldwin's testimony that she required a supportive work setting as inconsistent and "all over the place," he did not identify the inconsistent testimony or provide examples of how he was "all over the place." Doc. 20 at 13. She further contends the testimony was consistent with

---

thinking, or mood. *Id.* A GAF scale rating of 41–50 indicates serious symptoms such as suicidal ideation or any serious impairment in social, occupational or school functioning. *Id.* A GAF scale rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* A GAF scale rating of 61 to 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.*

The latest edition of the Manual has abandoned the GAF scale because of "its conceptual lack of clarity … and questionable psychometrics in routine practice." Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013). Even before that abandonment, "the Commissioner … declined to endorse the GAF scale for use in the Social Security and SSI disability programs, and … indicated that GAF scale ratings have no direct correlation to the severity requirements of the mental disorders listings." *Wind v. Barnhart*, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (internal quotations omitted) (citing 60 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000)); see also *McGregor v. Astrue*, No. 8:08-cv-2361-T-TGW, 2010 WL 138808, at *3 (M.D. Fla. Jan. 10, 2010) (unpublished) (GAF scale rating carries no meaningful weight). Nevertheless, the score is useful here to the extent it reveals Dr. Baldwin's opinions about the severity of Szala's limitations generally.

the medical records and his opinion of the severity of her impairments and limitations. Doc. 20 at 13. The Commissioner responds the ALJ's summary of Dr. Baldwin's testimony highlighted many of the inconsistences and demonstrates how he was "all over the place," often rambling and failing to respond to questions. Doc. 23 at 16–17.

While the ALJ did not expressly say he was listing inconsistencies, it is apparent he was doing so. The ALJ clearly articulated why he rejected of Dr. Baldwin's testimony—inconsistency—which is a valid consideration in weighing medical opinions. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c) (Commissioner may consider supportability and consistency of opinions); *see generally Phillips*, 357 F.3d at 1241 (ALJ may reject opinion that is inconsistent with doctor's own treatment notes). In identifying the inconsistences, the ALJ determined Dr. Baldwin did not sufficiently explain the bases for his opinions because they kept changing. Substantial evidence supports the ALJ's inconsistency finding and therefore his rejection of Dr. Baldwin's testimony.

**B.      Dr. Fox**

Substantial evidence supports the ALJ's decision to give Dr. Fox's opinions partial weight. The ALJ found the results of her testing and borderline intellectual functioning diagnosis consistent with the objective medical evidence and record as a whole but rejected her conclusion Szala cannot handle routine workday stress and her GAF scale rating of 45, finding she "is not so severely limited." Tr. 28, 508−09. Szala contends the ALJ offered no reason to support the rejection and "the totality of

the medical evidence supports Dr. Fox's opinion," citing Dr. Baldwin's testimony and Dr. Knox's consultative examination assessing a GAF scale rating of 45. Doc. 20 at 17–18.

Szala contends the ALJ could not discount Dr. Fox's opinions as a one-time examining physician because the ALJ specifically ordered her to perform an examination. Doc. 20 at 18–19. The ALJ, however, did not reject Dr. Fox's opinions solely because she examined Szala only once but instead deferred to Dr. Sanchez's findings as her treating physician to the extent that Dr. Fox found restrictions greater than he had. *See Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004) (affirming finding that the opinion of a consultative psychologist who examined the claimant only once "was not entitled to great weight"). Dr. Fox found Szala's impairment caused marked limitation in her ability to make judgments on simple work-related decisions, Tr. 508, while Dr. Sanchez found no functional limitation in that ability, Tr. 429. Dr. Sanchez also found a moderate limitation in Szala's ability to interact appropriately with the general public, Tr. 429, but Dr. Fox found a marked limitation. Tr. 509. The ALJ appropriately followed Dr. Sanchez's opinions regarding her limitations because he was Szala's treating physician and more familiar with her limitations. Tr. 28.

As to Dr. Fox's reliance on Szala's subjective reports, she argues the ALJ ignored the testing and mental-status examination Dr. Fox performed. Doc. 20 at 19–20. She does not identify any particular test she contends supports her impairments and functional limitations. *See generally id.* The ALJ observed that Dr. Fox had

administered the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV). Tr. 28. Dr. Fox described the test as "an individually administered test of intelligence" and observed that Szala's scores "consistently fell well below average." Tr. 514. The ALJ accepted Dr. Fox's opinion that she had borderline intellectual functioning. Tr. 28. The WAIS-IV did not address the additional limitations the ALJ rejected. Instead, in her report, Dr. Fox described Szala's characterization of her inability to work as a lack of patience with people, a tendency to hold things in and go into a rage, poor concentration, and impulsivity. Tr. 28, 511–12. Nevertheless, Dr. Fox observed, as the ALJ had, that Szala could "care for her children" and "perform household activities in a normal and reasonable manner." Tr. 28, 516.

Substantial evidence supports the ALJ's conclusion that Dr. Fox's opinions relating to the severity of Szala's limitations are based on self-reports, which the ALJ properly considered in evaluating Dr. Fox's opinions. *See Crawford*, 363 F.3d at 1159 (finding substantial evidence supported decision to discount medical opinion inconsistent with his treatment notes, unsupported by medical evidence, and appeared to be based primarily on the claimant's subjective complaints). For example, while Dr. Fox concludes Szala does not appear capable of withstanding stress, the basis for such opinion is that Szala "reports a history of decompensation related to stress." Tr. 517. Her opinion contains numerous recitations of Szala's statements and reports surrounding her symptoms.

Szala criticizes the ALJ's reliance on Szala's work history to discount Dr. Fox's opinion regarding her ability to work, particularly because she claims she became

disabled and unable to work as of the date she filed for benefits in December of 2010, and because the ALJ later said her poor work history raised a question about whether her continuing unemployment is due to medical impairments. Doc. 20 at 20–21, Tr. 28, 31. Szala alleges she became disabled in 1987, not 2010. Tr. 21, 240. The ALJ stated she has past relevant work because it demonstrates she could work long enough to learn how and to reach a substantial gainful activity level. Tr. 28. That contradicts Dr. Fox's conclusion that she could not handle the stress of a workday routine. Substantial evidence supports that finding; Szala worked as a collections agent off and on, earning as much as $9,729.72 during one period of employment that lasted at least six months. Tr. 56–57, 252.

In addressing the ALJ's evaluation of Dr. Fox's medical opinions, Szala observes the ALJ appeared influenced by her age and the resulting length of time for which she might receive benefits. Doc. 20 at 15–16. At the first hearing, the ALJ stated:

> [O]f course you know the rule is the conclusion only has to be accepted if supported by adequate medical findings and tests and exams, and it's very difficult for me to follow that in his records. It was not difficult, I'll be honest, it's impossible. So, again, I want to take another look. This lady fight [sic], you know, is not very old and if she goes on the roll she will probably be there for 40 years, 50 years and I'm not going to bite off that kind of obligation or make that kind of decision based upon the record, I don't feel comfortable with it.
> . . .
>
> So, I don't feel comfortable with Dr. Knox's examination on the part of the (INAUDIBLE), I'm not sure whether Dr. Sanchez's records support his conclusion, so I want another CE and I may or may not order an ME and that will clear it all up.

Tr. 46. While Szala suggests the statement indicates bias, she does not make any argument for reversal on that basis and therefore has waived any such argument. In any event, in context, the statement expresses only uncertainty about the record and not inappropriate bias.

Szala suggests the ALJ failed to state the weight he gave Dr. Fox's opinion that Szala had no useful ability to interact with supervisors and co-workers. Doc. 20 at 21. The ALJ's rejection of Dr. Fox's limitations regarding the workplace necessarily included her opinion that Szala had extreme limitations in her ability to interact appropriately with others in the workplace. Tr. 509. The ALJ also explained his rejection of the opinion insofar as Dr. Fox's limitations were more severe than Dr. Sanchez's, as explained above. To the extent the ALJ did not expressly state the weight he gave to Dr. Fox's opinion regarding interaction with others, an ALJ's determination may be implicit if the implication is "obvious to the reviewing court." *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir. 1983). The ALJ's rejection of Dr. Fox's opinions regarding Szala's limitations is apparent in his RFC finding that Szala could have occasional contact with the public, co-workers and supervisors. Tr. 25.

Thus, the ALJ adequately explained his decision to reject Dr. Fox's opinions and substantial evidence supports each of his reasons.

## C.    *Dr. Sanchez*

Szala contends the ALJ improperly disregarded part of Dr. Sanchez's opinion that would have supported her claim for benefits—that she had marked limitations in her ability to work with others, accept instructions, and respond appropriately to

criticism—by relying on her non-compliance with medication to conclude she could work. Doc. 20 at 22. The Commissioner responds the ALJ properly discounted Dr. Sanchez's marked limitations because they were inconsistent with his opinion in his letter and Szala's treatment. Doc. 23 at 7. In his letter, Dr. Sanchez reported Szala does well on her medication but is invariably non-compliant with medication for various reasons, which brings about flare-ups in her condition. Tr. 603–04. He opined she will have difficulty getting along with others but has intact intellectual and cognitive functions. Tr. 604. The ALJ did not rely on her failure to take medication as a basis for denying her benefits, but instead concluded the failure suggests her symptoms are not as severe as alleged.[5] Tr. 30–31.

The ALJ gave great weight to Dr. Sanchez's opinion that Szala had difficulty interacting with others and therefore limited her ability to occasional contact with co-workers in determining her RFC. Tr. 25, 27. The ALJ gave little weight to Dr. Sanchez's opinions in his medical impairment questionnaire that Szala had marked limitations in some areas of social functioning because he found these opinions were inconsistent with his letter regarding her impairments and his treatment of those impairments. Tr. 27. Good cause exists to discount Dr. Sanchez's opinions due to this inconsistency, *see Phillips*, 357 F.3d at 1240–41, because he noted in his letter only that she will have difficulties getting along with co-workers, but not that those difficulties would be extreme, and indicated that her symptoms including irritability

---

[5]Szala also argues the ALJ relied on her non-compliance to find she would have no limitations if she complied with her medications and treatment despite no opinion to that effect. Doc. 20 at 22. The ALJ, however, did not make that finding.

were reasonably controlled with medication. Tr. 603–04. The ALJ did not err in providing little weight to Dr. Sanchez's opinions he found inconsistent.[6]

## VII.  Conclusion

The Court **affirms** the Commissioner's decision denying Szala's claim for benefits and **directs** the clerk to enter judgment in favor of the Commissioner and close the file.

**Ordered** in Jacksonville, Florida, on October 27, 2015.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:      Counsel of Record

---

[6]The Commissioner also contends Dr. Sanchez's questionnaire opinions were conclusory. Doc. 23 at 8. The ALJ, however, did not rely on the conclusory nature of Dr. Sanchez's opinions as a basis for discounting them. The Court cannot reweigh the evidence or substitute its judgment for that of the ALJ. *See Moore,* 405 F.3d at 1211.